IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BROWN & BROWN, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 07 C 2893 |
| v. | ) |
| | ) Judge Ruben Castillo |
| MUHAMMAD MUNAWAR ALI | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

On May 23, 2007, Plaintiff Brown & Brown, Inc., d/b/a Risk Management Services and Program Management Services, Inc. ("Brown"), filed this suit against its former employee, Muhammad Munawar Ali ("Ali") for breach of his employment agreement, alleging that Ali solicited Brown's customers and disclosed Brown's confidences. (R. 1, Compl.) The next day, Brown filed a motion for a preliminary injunction, claiming that Ali's alleged breach of contract would cause Brown irreparable harm absent immediate injunctive relief. (R. 8, Mot. for Prelim. Inj.) On June 19, 2007, after briefing by the parties, this Court held a hearing on Brown's motion for a preliminary injunction. For the following reasons, the motion is granted in part and denied in part.

## FACTS

In 1998, Ali worked as an actuary at Coregis Insurance ("Coregis"). (R. 14, Ali Opp'n Br., Ex. 1, Ali Decl. ¶ 6.) During that time, he met John Starich ("Starich"), a Senior Vice President of Commercial Insurance for John Burnham Insurance Services. Starich is the retail broker for the San Diego County Schools Risk Management Joint Powers Authority ("JPA").

(R. 14, Ali Opp'n Br., Ex. 2, Starich Decl. ¶2.) As JPA's retail broker, Starich either works directly with insurance companies to obtain various lines of insurance coverage, or hires wholesalers to find a suitable insurance carrier and policy for JPA. (*Id.* ¶ 3.) Coregis was JPA's wholesale broker at that time.

In 2001, two of Ali's colleagues at Coregis, Scott Keller ("Keller") and Carol Wells ("Wells"), left Coregis to work for Governmental Risk Solutions, LLC, ("GRS"), and Ali later followed them to GRS. (R. 14, Ali Opp'n Br., Ex. 2, Starich Decl. ¶¶ 6-7; R. 14, Ex. 3, Keller Decl. ¶ 6.) Subsequently, Starich hired GRS to place JPA's property and liability lines of coverage. (*Id.*) During Ali's tenure at GRS, he worked on JPA's lines of coverage and attempted to capture other lines of coverage from JPA, such as workers' compensation. (R. 14, Ali Opp'n Br., Ex. 1, Ali Decl. ¶ 9; R. 14, Ali Opp'n Br., Ex. 3, Keller Decl. ¶ 9.)

Brown hired Ali in January 2003 as a vice president in its newly created Chicago office, Brown & Brown Public Entity Services ("BBPES"). (R. 15, Ali Answer ¶ 25.) Brown is a national insurance brokerage and service company, offering a wide range of insurance and reinsurance products and services, as well as risk management, third party administration, and other services to both the public and private sectors. (R. 15, Ali Answer ¶ 7.) Brown sells multiple lines of insurance to its customers. (R. 16, Brown Reply, Ex. 1, Parker Decl. ¶ 13.) Starich moved JPA's workers' compensation account to Brown after Ali went to Brown. (R. 14, Ex. 2, Starich Decl. ¶ 8, R. 14, Ex. 1, Ali Decl. ¶ 12.)

While employed by Brown, Ali signed an Employment Agreement, which contained the following non-solicitation and confidentiality provisions:

> Employee recognizes and acknowledges that the Confidential Information (as

> hereafter defined) constitutes valuable, secret, special, and unique assets of Company. Employee covenants and agrees that, during the term of this Agreement and for a period of two (2) years following termination of Employee's employment with the Company for any reason (whether voluntary or involuntary), Employee will not disclose the Confidential Information to any person, firm, corporation, association, or other entity for any reason or purpose without the express written approval of Company and will not use the Confidential Information except in Company's business. . . . The term "Confidential Information" includes all information, whether or not reduced to written or recorded form, that is related to Company and that is not generally known to competitors of the Company nor intended for general dissemination, whether furnished by Company or compiled by Employee, including but not limited to: (i) lists of the Company's customers, insurance carriers, Company accounts and records pertaining thereto; and (ii) prospect lists, policy forms, and/or rating information, expiration dates, information on risk characteristics, information concerning insurance markets for large or unusual risks, and all other types of written information customarily used by Company or available to the Employee. . . .

(R. 1, Compl., Ex. C, Employment Agreement ¶ 8(a).) The Employment Agreement further stated that:

> For a period of two (2) years following termination of Employee's employment with the Company for any reason (whether voluntary or involuntary), Employee specifically agrees not to solicit, divert, accept, nor service, directly or indirectly, as insurance solicitor, insurance agent, insurance broker, insurance wholesaler, managing general agent, or otherwise, for Employees account or the account of any other agent broker or insurer, either as officer, director stockholder, owner partner, employee, promoter, consultant, manager or otherwise, any insurance or bond business of any kind or character from any person, firm, corporation, or other entity, that is a customer or account of the Company during the term of this Agreement, or from any prospective customer or account to whom the Company made proposals about which Employee had knowledge, or in which Employee participated, during the last two (2) years of Employee's employment with Company. . . .

(*Id.* ¶ 8(b).)

Ali gave his notice of resignation from Brown on or about February 25, 2007. (R. 15, Ali Answer ¶ 29.) At the time of Ali's departure from Brown, he was the Profit Center Leader for BBPES and the head of the Chicago office. (*Id.* ¶ 28.) Ali's last day in the office was on or

about February 28, 2007, and his employment with Brown formally ended on March 9, 2007. (*Id.* ¶ 30.)

A few days after Ali's departure, Karl Snearer ("Snearer"), the President of a Brown profit center called Apex Insurance, Inc., met with Starich to discuss hiring Ali as a Brown consultant on the JPA account because Starich was considering terminating JPA's account with Brown due to Ali's departure. (R. 14, Ali Opp'n Br., Ex. 2, Starich Decl. ¶ 11.) Snearer took over Ali's position at Brown on or about February 26, 2007. (R. 16, Brown Reply, Ex. 3, Snearer Decl. ¶ 3.) Brown and Ali negotiated but did not reach agreement on a consultant arrangement. (R. 14, Ali Opp'n Br., Ex. 1, Ali Decl. ¶ 19.)

On or about April 2, 2007, Starich terminated Brown as JPA's workers' compensation wholesaler and hired GRS. (R. 14, Ali Opp'n Br., Ex. 2, Starich Decl. ¶ 12.) Two days later, Brown received an email at Ali's old Brown email address in which Gene Levine ("Levine"), an underwriter at Liberty Mutual Insurance Company ("Liberty Mutual"), attempted to contact Ali regarding an email Levine had received from Starich. (R. 1, Compl., Ex. F, e-mail chain.) The original email from Starich to Levine, sent on April 4, 2007, stated:

Dear Gene:

You should have received our B of R yesterday transferring our wholesaler/intermediary for the captioned from Brown & Brown to Governmental Risk Solutions.

Regarding the 7-1-07 to 7-1-08 coverage term, be advised that Mr. Ali is authorized by us to provide any necessary assistance to you, and to negotiate with you on our behalf, in developing the rate proposal for that term. The JPA is aware of and concurs with this arrangement.

Gene, we would ideally like to have your formal proposal transmitted to Mr. Ali for his review by April 13.

4

Thank you, Gene. Please call me if you have any questions or concerns.

(*Id.*) Levine forwarded this email to Ali's old email address on April 6, 2007, adding: "Mun-In order for a formal quote, we need the following. We need to 2007/08 exposures/members and concentrations. Ground up 5 year losses, currently valued." (*Id.*)

On or about April 18, 2007, Ali spoke with Levine. (R. 14, Ali Opp'n Br., Ex. 1, Ali Decl. ¶ 24.) Under the terms of JPA's existing workers' compensation contract, Liberty Mutual would increase its premium 2% on July 1, 2007, unless JPA could convince Liberty Mutual to renegotiate. (R. 14, Ali Opp'n Br., Ex. 1, Ali Decl. ¶¶ 20-21; R. 14, Ali Opp'n Br., Ex. 2, Starich Decl. ¶ 16.) At Starich's request, Ali spoke with Levine and convinced him to reduce the applicable premium by 1.5%, instead of raising it. (R. 14, Ali Opp'n Br., Ex. 1, Ali Decl. ¶¶ 23-24.) Ali received no compensation for his involvement in the JPA account with GRS. (*Id.* ¶¶ 25-27.)

In late March 2007, Ali became President of Accretive Insurance Agency ("Accretive"). (R. 14, Ali Opp'n Br., Ex. 1, Ali Decl. ¶ 3.) Since joining Accretive, Ali has developed proposals for public entities for lines of coverage other than those Brown had placed for the same public entity. (R. 14, Ali Opp'n Br., Ex. 1, Ali Decl. ¶ 32.) Specifically, Ali states that:

> . . . after the termination of my employment with Brown, I was approached by Bill Young of PEGAS, which administers several pools, to help him on the workers' compensation and property lines of business for SEL, a New Jersey pool. Brown had never written or made proposals for these linse of coverage. PEGAS and RLM provided me with the information required to create an insurance submission. Under my direction, Accretive created submissions, contacted various insurance carriers, and made proposals to Bill Young. No business resulted from this work. As far as I know, Brown remains the broker for all 6 lines of business that I worked on under the SEL umbrella at Brown - only one of which Brown had ever written before my arrival of SEL.

5

(*Id.*)

Based on this evidence of Ali's contact with two of Brown's customers, JPA and PEGAS/SEL, and the possibility that Ali has contacted additional Brown customers, Brown seeks to enjoin Ali and Accretive from violating the non-solicitation and confidentiality provisions of the Employment Agreement.

## ANALYSIS

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).[1] To obtain a preliminary injunction, the movant must show: (1) some likelihood of success on the merits; (2) no adequate remedy at law exists; (3) they will suffer irreparable harm which, absent injunctive relief, outweighs the harm the non-movant will suffer if the injunction is granted; and (4) the injunction will not harm the public interest. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002). The Court employs a "sliding scale" analysis, whereby the greater the likelihood of success on the merits, the less of a showing that is required relative to risk of harm, and vice versa. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). In deciding whether to grant injunctive relief, the Court must bear in mind that the purpose of a preliminary injunction is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149

---

[1] Federal law determines the grant or denial of a preliminary injunction. *See Vencor, Inc. v. Webb*, 33 F.3d 840, 845 (7th Cir. 1994) (Kentucky law governed contract, but federal law governed preliminary injunction standard); *see also Outsource Intern., Inc. v. Barton*, 192 F.3d 662, 673-74 (7th Cir. 1999) (Posner, J., dissenting).

F.3d 722, 726 (7th Cir. 1998).

I. **Substantial Likelihood of Success on the Merits**

   A. **Validity of Restrictive Covenant**

To recover for breach of the Employment Agreement, Brown must first show that that the restrictive covenants are valid. The parties agree that Florida law applies to the terms of the Employment Agreement. (R. 14, Ali Opp'n Br. at 7.) Under Florida law, a party seeking to enforce a non-solicitation clause must prove the existence of one or more "legitimate business interests" justifying the clause, and show that the restraint is "reasonably necessary" to protect those interests. Fla. Stat. Ann. § 542.335 (2007).

   1. **Legitimate Business Interest**

The Florida statute defines the term "legitimate business interest" to include, among other things, valuable confidential business or professional information, substantial relationships with specific prospective or existing customers, customer goodwill associated with a specific marketing or trade area, and extraordinary or specialized training. Fla. Stat. Ann. § 542.335(1)(b). "A court shall construe a restrictive covenant in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement." Fla. Stat. Ann. § 542.335(1)(h). In addition, "[a] court shall not employ any rule of contract construction that requires the court to construe a restrictive covenant narrowly, against the restraint, or against the drafter of the contract." *Id.*

Brown claims that it has a legitimate business interest in its: confidential business information, substantial relationships with its customers, customer goodwill generated in the public sector of the insurance industry, and the extraordinary and specialized training it provides

7

to its brokers.

### a. Confidential Business Information

Ali does not deny that in his vice president position, and in charge of Brown's Chicago office, he had access to confidential information about Brown, and James Parker ("Parker"), Programs Manager of BBPES, further attests that Ali received much confidential information throughout his employment at Brown. (R. 16, Brown Reply, Ex. 1, Parker Decl ¶ 4.) As the Florida statute affirmatively lists protection of valuable confidential business or professional information as a legitimate business interest, this Court finds that Brown has established such interest in the confidential information Ali was exposed to during his employ. *Lubkey v. CompuVac Sys., Inc.*, 787 So.2d 121, 124 (Fla. Dist. Ct. App. 2001) (citing Fla. Stat. § 542.335(1)(b)(2), defining "legitimate business interest" to include "valuable confidential business or professional information").

### b. Substantial relationships with customers

"There is little question under Florida law that an employer has a legitimate business interest in prohibiting solicitation of its customers with whom the employee has a substantial relationship." *N. Am. Prods. Corp. v. Moore*, 196 F. Supp. 2d 1217, 1228 (M.D. Fla. 2002). Specifically, an employer has a legitimate business interest under the Florida statute where an employee gains substantial knowledge of his former employer's customers, their purchasing history, and their needs and specifications. *Moore*, 196 F. Supp. 2d at 1228. Brown invests substantial resources in developing relationships with clients. (R. 16, Brown Reply, Ex. 1, Parker Decl. ¶ 13.) Likewise, Brown works hard to maintain customer goodwill to keep its customers as well as increase the lines of insurance Brown sells to its customers. (*Id.*) While Ali

claims he had knowledge of JPA before working at Brown, his relationship with Starich and JPA grew through his employment at Brown, as his knowledge of the public entity brokerage business and of JPA's needs in particular increased. Ali developed relationships with other Brown customers, such as PEGAS/SEL, through his employment at Brown, and therefore Brown also has a substantial protectible relationship with these customers.

### (1) JPA

Ali argues that Brown does not have a legitimate business interest in JPA's business because JPA constituted Ali's "personal client" who came to Brown "only as a result of [Ali's] own independent recruitment efforts." Ali cites to a case interpreting New York law for this proposition. In *Merrill Lynch, Pierce, Fenner & Smith v. Dunn*, the Florida District Court quoted a New York state case which held that: "It would be unreasonable to extend the covenant to personal clients of defendant who came to the firm solely to avail themselves of his services and only as a result of his own independent recruitment efforts, which [the employer] neither subsidized nor otherwise financially supported as a part of a program of client development." 191 F. Supp. 2d 1346, 1353 (M.D. Fla. 2002) (citing *BDO v. Hirshberg*, 93 N.Y.2d 382, 690 N.Y.S.2d 854, 712 N.E.2d 1220 (1999)). The evidence in this case, by contrast, as shown by the Declarations of Parker and Snearer, is that Brown subsidized and provided financial support for Ali's development of his relationship with JPA and Starich.[2]

---

[2] Ali also argues that placing public entity insurance is "akin" to a competitive bidding process, which Ali claims precludes forming substantial relationship with customers. (R. 14, Ali Opp'n Br. at 13.) Not only does the case Ali cites not stand for this proposition, but there is no precedent, and indeed, little analogy between an open bidding process over which an employer has no control, and Brown's insurance customers such as JPA, which Ali believes hired Brown due to his personal contacts.

9

In addition, Ali argues that Brown has no legitimate business interest in "former" customers such as JPA, since JPA broke with Brown on April 2, 2007, and Ali did not speak on JPA's behalf to Liberty Mutual until April 18, 2007. The Employment Agreement, however, specifically precludes Ali from "soliciting, diverting, accepting, or servicing, directly or indirectly, . . . any insurance or bond business of any kind or character from any person, firm, corporation, or other entity, <u>that is a customer or account of the Company during the term of this Agreement</u>." (R. 1, Compl., Ex. C, Employment Agreement ¶ 8(b) (emphasis added).) The JPA was a customer of Brown during the term of the Agreement, which states that it went into effect on January 13, 2003. (*Id.* at 1.) Florida law permits such restrictions on competition with former customers of employers: "Subsection 542.33(2)(a) provides that an employee may agree with an employer to: [R]efrain from carrying on or engaging in a similar business and from soliciting old customers of such employers within a reasonably limited time and area, . . . so long as such employer, continues to carry on a like business therein. Said agreements may, in the discretion of a court of competent jurisdiction, be enforced by injunction." *Globe Data Sys. v. Johnson*, 745 So.2d 1101, 1103 (Fla. Dist. Ct. App. 1999). Accordingly, Brown had a legitimate business interest in its relationship with JPA.

### (2) Other Lines of Insurance Coverage

Brown claims that Ali also breached the Employment Agreement through his solicitation of Brown customers for other lines of insurance coverage. The plain language of the Employment Agreement states: "Employee specifically agrees not to solicit, divert, accept, nor service, directly or indirectly, . . . <u>any insurance or bond business of any kind or character from any person, firm, corporation, or other entity</u>, that is a customer or account of the Company

10

during the term of this Agreement, or from any prospective customer or account to whom the Company made proposals about which Employee had knowledge, or in which Employee participated." (R. 1, Compl., Ex. C, Employment Agreement ¶ 8(b) (emphasis added).) Ali argues that his contact with other Brown clients does not violate the Employment Agreement because he is soliciting business for different lines of insurance than those which Brown covered. Ali points to an Eastern District of Pennsylvania case interpreting a collective bargaining agreement to support his argument that he is free to solicit other lines of insurance from Brown's customers, but that case does not support overturning or ignoring the plain language of the contract. In *Prudential Ins. Co. of Am. v. Stella*, the court made only very brief reference to the different lines of insurance at issue, denying the preliminary injunction in part because the defendant "ha[d] not sold any life insurance to any of his former life insurance customers nor ha[d] he sold any property, casualty or other insurance to anyone who was a former Prudential client. . ." 994 F. Supp. 308, 317 (E.D. Pa. 1998). The Pennsylvania court never distinguished between the protectibility of the employer's interest in the different lines of insurance, and thus this case does not help Ali's argument.

Conversely, the caselaw and the evidence presented supports a finding that Brown has a legitimate business interest in all lines of insurance sold to its customers. In *Globe Data Systems v. Johnson*, the Florida Court of Appeals reversed the denial of a preliminary injunction where the defendant, working for a competitor of his former employer, admitted to offering to supply his former employer's customers with other types of products that the former employer did not offer. 745 So.2d 1101, 1102 (Fla. Dist. Ct. App. 1999). Moreover, Parker attested that a critical component of Brown's business model is growing business through cross-selling multiple lines

of insurance to its current customers. (R. 16, Brown Reply, Ex. 1, Parker Decl. ¶ 13.) Even Ali, as a Brown employee, helped expand the lines of coverage offered to Brown's clients. (R. 14, Ali Opp'n Br., Ex. 1, Ali Decl.) This Court will thus enforce the plain language of the Employment Agreement, which precludes Ali from servicing or soliciting Brown's customers for insurance business "of any kind or character."

### c. Customer Goodwill

The evidence presented also shows that Brown invested substantial sums of money in developing customer goodwill with its insurance clients and their representatives. For example, since February 2004, Brown reimbursed Ali approximately $270,000 for travel, entertainment, cell phone usage, and other client development expenses. (R. 16, Brown Reply, Ex. 1, Parker Decl. ¶ 7.) Ali admits that he spent <u>at least</u> $16,000 in the 12 months before his departure on developing his customer relationship and goodwill the JPA account. (*Id.* ¶ 8.) Because Brown has invested considerable amounts of money and effort to develop and maintain the goodwill of JPA, PEGAS/SEL and Brown's other customers, it is entitled to protect this legitimate business interest. *See Merrill Lynch*, 191 F. Supp. 2d at 1353; *Litwinczuk v. Palm Beach Cardiovascular Clinic, L.C.*, 939 So.2d 268, 272 (Fla. Dist. Ct. App. 2006); *In re Jotan, Inc.*, 229 B.R. 218, 219 (M.D. Fla. 1998).

### d. Extraordinary and Specialized Training

Brown, however, does not provide any evidence of extraordinary or specialized training. Brown's assumption that because Ali did little or no brokerage work before coming to Brown, Brown must have provided him with tremendous training in this area, is insufficient to show extraordinary and specialized training. Under Florida law, "[i]n order for training to be a

12

protectible business interest, it must be extraordinary. Training is classified as extraordinary when it exceeds what is usual, regular, common, or customary in the industry in which the employee is employed." *Dyer v. Pioneer Concepts, Inc.*, 667 So.2d 961, 964 (Fla. Dist. Ct. App. 1996) (internal citations and quotations omitted). Brown presents no evidence that its quarterly leadership meetings and quality control program, nor the money its spends sending its brokers to conferences, constitute anything out of the ordinary from what other companies in the industry do. (R. 16, Reply at 7-8.)

### 2. Reasonably Necessary

As Brown has shown at least three legitimate business interests protected by the Employment Agreement's restrictive covenant, Florida Statute § 542.335(1) next mandates that the restrictive covenant be "reasonable in time, area, and line of business." *Milner Voice and Data, Inc. v. Tassy*, 377 F. Supp. 2d 1209, 1217 (S.D. Fla. 2005) (citing Fla. Stat. Ann. § 542.335(1)). While Ali does not dispute that Brown's non-solicitation and confidentiality covenants are reasonable in time and area,[3] he argues that the covenants are overbroad in that they seek to prohibit him from soliciting Brown's customers as to *any* line of insurance, rather than only the line of insurance which the customer purchased from Brown. As explained above, Brown has a legitimate business interest in all lines of insurance sold to its customers and, accordingly, this covenant is not overbroad. (R. 1, Compl., Ex. C, Employment Agreement ¶ 8(b).) Therefore, Brown's restrictive covenant is valid and enforceable as it is reasonably necessary to protect Brown's legitimate business interests.

---

[3] Indeed, multiple Florida courts have upheld two-year periods for restrictive covenants. *See, e.g., Milner*, 377 F. Supp. 2d at 1221; *Am. II Elecs., Inc. v. Smith*, 830 So. 2d 906, 907 (Fla. Dist. Ct. App. 2002).

### B. Breach of Confidentiality Provision

Brown points to allegedly missing confidential information from Ali's former office at Brown as evidence that Ali breached the confidentiality provision of the Employment Agreement. Ali swears that he has taken no confidential information from Brown. (R. 14, Ali Opp'n Br., Ex. 1, Ali Decl.) Nevertheless, through his position and years at Brown, Ali has admittedly had access to much of Brown's confidential information. The Employment Agreement prohibits Ali from disclosing all confidential information, even that which was not reduced to written or recorded form, including, but not limited to: "(i) lists of the Company's customers, insurance carriers, Company accounts and records pertaining thereto; and (ii) prospect lists, policy forms, and/or rating information, expiration dates, information on risk characteristics, information concerning insurance markets for large or unusual risks, and all other types of written information customarily used by Company or available to the Employee." (R. 1, Compl., Ex. B, Employment Agreement ¶ 8(a).) Ali appears to have disclosed some of this confidential information in his Declaration, and has, by his own admission, contacted several of Brown's customers whom he first made contact with through his employment at Brown. As such, this case is distinguishable from *Passalacqua v. Naviant, Inc.*, on which Ali relies, where the plaintiff could not identify a single customer approached by the defendant or any confidential data used by the defendant. 844 So.2d 792, 796 (Fla. Dist. Ct. App. 2003). Accordingly, Brown has established a substantial likelihood of success on the merits on its claim for breach the confidentiality provision of the Employment Agreement.

### C. Breach of Non-Solicitation Provision

Brown also has established a substantial likelihood of success in showing that Ali

14

breached the non-solicitation provision, Paragraph 8(b), of the Employment Agreement, which prohibits Ali from soliciting, diverting, accepting nor servicing any insurance business "that is a customer or account of the Company during the term of this Agreement." (R. 1, Compl., Ex. C, Employment Agreement ¶ 8(b).)

### 1. JPA

First, it appears that Ali breached the Agreement as to JPA through his phone conversation with Liberty Mutual. As explained above, JPA was a customer of Brown during the term of the Agreement, which states that it went into effect on January 13, 2003. (*Id.* at 1.) In addition, while the contract does not specifically define "servicing," the evidence presented supports Brown's claim that Ali did, indeed, service the JPA account in violation of the Employment Agreement because Ali had JPA's direct authorization to negotiate insurance rates on its behalf.[4] Ali presents no evidence or caselaw to indicate that the fact that he did not receive compensation for his work on behalf of JPA is determinative of whether he was servicing JPA. In addition, Brown's post-resignation attempt to hire Ali as a consultant to JPA does not void the restrictive covenant in the Employment Agreement, as those negotiations fell through, and Ali's service on behalf of JPA was independent of his negotiations with Brown.

### 2. PEGAS/SEL

Ali next argues that his solicitation of business from PEGAS/SEL and other Brown

---

[4]Ali's citation to *Sabina v. Dahlia*, 650 So.2d 96 (Fla. Dist. Ct. App. 1995), does not help his case. In *Sabina*, the restrictive covenant, by its terms, only prohibited "soliciting" or "calling upon" customers. *Id.* at 97. Accordingly, that court found that the former employee did not vioate his employment agreement, because his former employer's customers contacted him, not the other way around. *Id.* at 99. In contrast, in the instant case, the restrictive covenant also prohibits "servicing" Brown's customers or prospective customers.

customers does not violate the Employment Agreement because he is soliciting other lines of insurance, not the line of insurance that Brown services for PEGAS/SEL and the other clients. As explained above, the Employment Agreement, on its face, prohibits Ali from soliciting even other lines of insurance from Brown's customers. Accordingly, Ali's admissions that he has solicited Brown's customers for these other lines of insurance demonstrate Brown's substantial likelihood of success in showing Ali's violation of the Employment Agreement as to Brown's other customers besides JPA.

## II. Inadequate Remedy at Law/Irreparable Harm

The Seventh Circuit has held that "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill. . . ." *Ty, Inc.*, 237 F.3d at 902. Thus, these type of injuries are presumed irreparable. *Id.*; *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir.1994) ("We have stated that showing injury to goodwill can constitute irreparable harm that is not compensable by an award of money damages."); *Reinders Bros. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 53 & n. 7 (7th Cir. 1980) (loss of small but valuable portion of clientele not compensable in monetary damages). Ali's own declaration suggests that he is, or has been, actively soliciting Brown's customers. Although no customer besides JPA has left Brown yet, Ali's active solicitation of Brown's customers has the potential to weaken Brown's relationships and goodwill with these customers, to whom Brown hopes to sell additional lines of insurance coverage. Even if Brown could obtain money damages for lost "commissions" due to Ali's alleged breach, this does not resolve Brown's alleged loss of customers and goodwill, nor does it address the fact raised by Ali that he is contacting other Brown customers. (R. 14, Ali Opp'n Br.,

16

Ex. 1, Ali Decl. ¶ 32.)

### III. Balancing of Harms

"In balancing the harms, the court must weigh the error of denying a preliminary injunction to the party who would win the case on the merits against the error of granting an injunction to the party who would lose." *FoodComm Intern. v. Barry*, 328 F.3d 300, 305 (7th Cir. 2003). The harm to Ali from an injunction would be that he could not solicit business from any of Brown's customers, which the evidence presented suggests would restrict Ali from less than 10% of the total public entity insurance brokerage market, leaving open a number of other opportunities. (R. 16, Brown Reply, Ex. 3, Snearer Decl. ¶ 22.) By contrast, the harm to Brown is much greater, and potentially irreparable, in the form of its lost ability to maintain and pursue relationships with its customers, whom Ali has admitted to soliciting. *See FoodComm Intern.*, 328 F.3d at 305. Therefore, we conclude that any potential harm to Ali is outweighed by the harm to Brown.

### IV. Public Interest

Finally, the court must consider the interest of and harm to nonparties from a denial or grant of the injunction; *i.e.*, the public interest. *Reid L. v. Illinois State Bd. of Educ.*, 289 F.3d 1009, 1021 (7th Cir. 2002). Courts in this District have recognized that the public interest is served by enforcing valid contracts. *SMC Corp., Ltd. v. Lockjaw, LLC*, 481 F. Supp. 2d 918, 929 (N.D. Ill. 2007); *Cook Inc. v. Boston Scientific Corp.*, No. 01 C 9479, 2002 WL 31236289 at *6 (N.D. Ill. Oct. 1, 2002); *Arcadia Health Serv., Inc., v. A+ Health Care, Inc.*, No. 96 C 8363, 1997 WL 24737 at *5 (N.D. Ill. Jan. 17, 1997).

Ali argues that his phone call to Liberty Mutual saved San Diego County hundreds of

thousands of dollars by lowering insurance premiums and that this savings to the taxpayers of San Diego County outweighs any interest in enforcing the Employment Agreement. Ali has not identified any potential harm to the public if injunctive relief is granted as to his solicitation of other Brown customers. While the savings to the San Diego taxpayers is commendable, this one-time public benefit does not outweigh the harm from continuing violations of the Employment Agreement, which harms the public interest in having valid contracts enforced. Accordingly, this Court finds that the public interest factor weighs in favor of granting Brown's request for injunctive relief.

## V. Bond

Federal Rule of Civil Procedure 65(c) requires that:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed. R. Civ. P. 65(c). The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him. *Ty, Inc.*, 292 F.3d at 512. The appropriate amount of the bond is subject to our discretion. Fed. R. Civ. P. 65(c); *Gateway*, 35 F.3d at 1141. The Seventh Circuit has directed that "[w]hen setting the amount of security, district courts should err on the high side." *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000). Setting the amount of security too low may produce irreparable injury "because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Id.*

Neither Brown nor Ali have addressed the issue of bond, or offered any suggestion as to

an appropriate bond amount. Accordingly, this Court believes that the circumstances of this case require a moderate bond of $100,000.

## CONCLUSION

For the foregoing reasons, Brown's motion for preliminary injunction (R. 8) is granted in part and denied in part. The Court grants Brown's motion as to Ali, but denies the motion as to Ali's employer, Accretive, which was not party to the Employment Agreement.[5] The preliminary injunction shall apply as follows:

1. Ali, his agents, servants, employees, attorneys, and those in active concert or participation with him who receive actual notice of this order by personal service or otherwise pursuant to Fed.R.Civ.P. 65(d), are hereby ENJOINED from violating the terms of the non-solicitation provision of his Employment Agreement with Brown (¶ 8(b)), for a period of two years after Ali's employment at Brown, by directly or indirectly soliciting, diverting, accepting, or servicing—with regard to any line of insurance coverage—any person, firm or entity that was a customer or account of Brown during the term of his employment, or was a prospective customer or acount to whom Brown made proposals about which Ali had knowledge, or in which he participated, within the last two (2) years of his employment with Brown, unless Ali obtains Brown's express written consent.

2. Ali, his agents, servants, employees, attorneys, and those in active concert or participation with him who receive actual notice of this order by personal service or otherwise pursuant to Fed.R.Civ.P. 65(d), are hereby ENJOINED from violating the terms of the confidentiality provision of his Employment Agreement with Brown (¶ 8(a)) by disclosing any confidential Brown information as defined in the Employment Agreement for a period of two years after Ali's employment ended with Brown, unless Ali obtains Brown's express written consent. If Ali possesses any written confidential Brown

---

[5] In its reply and at the hearing on Brown's motion for preliminary injunctive, Brown requested that any injunction in this case should apply to Accretive as well because of Brown's fear that Ali could instruct his co-workers to carry out violations of his Employment Agreement. (R. 16, Brown Reply at 15.) Accretive, however, is not a party to the action so relief cannot be granted against it. Federal Rules of Civil Procedure Rule 65(d) mandates that an injunction "is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Fed. R. Civ. P. 65(d). *See also United States v. Kirschenbaum*, 156 F.3d 784, 794 (7th Cir. 1998) (explaining that district court may not enjoin non-parties except as provided in Rule 65(d)).

information, Ali shall return that information immediately.

3. Brown is directed to post a bond of $100,000 to secure this preliminary injunction pursuant to Fed. R. Civ. P. 65(c).

The Clerk of the Court is directed to enter a separate judgment order pursuant to Federal Rule of Civil Procedure 58(a)(1). The Court sets this matter for a status hearing on July 11, 2007, at 9:45 a.m., to discuss a firm litigation schedule for this case. The parties are also requested to fully exhaust all remaining settlement possibilities for this dispute.

                                          **ENTERED:**

                                          **Ruben Castillo**
                                          **United States District Judge**

**Dated: June 25, 2007**